UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ERIN PAPKEE,<br><br>    Plaintiff,<br><br>    v.<br><br>MECAP, LLC d/b/a MILK STREET CAPITAL and SCOTT LALUMIERE,<br><br>    Defendant. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Erin Papkee ("Ms. Papkee"), by and through undersigned counsel, and complains against the Defendants, MECAP, LLC d/b/a Milk Street Capital ("MECAP") and Scott Lalumiere ("Mr. Lalumiere"), as follows:

JURISDICTION AND PARTIES

1. This action arises under the Fair Labor Standards Act of 1938, as amended ("FLSA"), 29 U.S.C. §201, *et seq.*, the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§831 *et seq.*, as enforced through the Maine Human Rights Act ("MHRA"), and 26 M.R.S. § 664 ("Maine Wage Statute").

2. This action also includes common law claims for tortious interference.

3. Ms. Papkee is a United States citizen residing in the City of Portland, County of Cumberland, State of Maine.

4. Ms. Papkee was known as Erin Leigh Mancini at the time she was employed by Defendants.

1

5. MECAP is a Maine limited liability corporation that has or had a principal place of business in the City of Portland, County of Cumberland, State of Maine.

6. Mr. Lalumiere is a United States citizen residing in the City of Portland, County of Cumberland, State of Maine.

7. At all times relevant to this case MECAP had one or more employees.

8. At all times relevant to this case MECAP had employees who engaged in interstate commerce and does $500,000 dollars or more in annual business.

9. While employed by Defendants, Ms. Papkee was an employee covered by FLSA's overtime pay requirements.

10. This Court has subject matter jurisdiction over Ms. Papkee's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

11. On April 19, 2019, Ms. Papkee filed a timely Complaint of Discrimination against MECAP alleging unlawful whistleblower retaliation with the Maine Human Rights Commission ("MHRC").

12. On or about January 7, 2020, the MHRC issued a Notice of Right to Sue with respect to Ms. Papkee's WPA claims.

13. Ms. Papkee has exhausted her administrative remedies with respect to all claims requiring administrative exhaustion set forth in this Complaint.

JURY TRIAL REQUESTED

14. Ms. Papkee requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

15. MECAP is a loan brokerage, property management, and real estate development firm.

16. Mr. Lalumiere is the sole shareholder of MECAP and managed the business.

17. Ms. Papkee was a project manager for MECAP from October 2016 until she was fired or forced to resign on January 10, 2019.

18. Ms. Papkee was appropriately classified as an employee when she was hired.

19. Ms. Papkee worked full time under the control and supervision of Mr. Lalumiere.

20. The normal work week for Ms. Papkee was 40 hours per week.

21. Ms. Papkee was paid $960 per week regardless of how many hours per week she worked.

22. Ms. Papkee routinely worked from 40 to 50 hours per week driving to remote locations on weekends to handle Defendants' projects without getting paid overtime.

23. Ms. Papkee was entitled to payment equal to 1.5 times her pay for forty hours per week for all hours that she worked over forty hours in a week.

24. Defendants' failure to pay Ms. Papkee overtime premium for hours worked over forty violated the FLSA and also the Maine Wage Law, 26 M.R.S. § 644(3).

25. Throughout Ms. Papkee's employment, Mr. Lalumiere and Ms. Papkee would exchange work-related emails as early as 6:14 AM and as late as 9:13 PM.

26. Ms. Papkee was also not paid for work-related mileage or tolls even though she often drove hundreds of miles per week for work.

27. In about September 2018, when Ms. Papkee asked Mr. Lalumiere to pay for mileage and tolls, he proposed instead to increase her weekly pay and stop withholding employment taxes from her pay.

28. Ms. Papkee agreed to this arrangement as she believed it would compensate her for her mileage and other transportation costs like car repairs, tires, and tolls.

29. Ms. Papkee's new rate of pay was $1,200 per week.

30. Ms. Papkee was not paid by the project; she was paid the same amount every week.

31. Nothing else changed about the work Ms. Papkee performed or where she performed her work.

32. Mr. Lalumiere continued to control the manner in which Ms. Papkee performed her work.

33. Mr. Lalumiere had control over Ms. Papkee's work hours, where she worked, and how she performed her work.

34. Ms. Papkee's services were thoroughly integrated into MECAP's business operations.

35. Ms. Papkee did not operate a separate business that provided services to Defendants.

36. While employed by Defendants, Ms. Papkee did not provide services to companies that are unrelated to Defendants.

37. Ms. Papkee was not involved in her own real estate projects that would have caused a conflict of interest if she had continued to be classified properly as an employee.

38. Ms. Papkee performed her job duties satisfactorily.

39.     Ms. Papkee denies that Mr. Lalumiere received complaints about her work from vendors, brokers, and others regarding matters under Ms. Papkee's control for which Ms. Papkee was responsible.

40.     MECAP underfunded projects that Ms. Papkee was responsible for, and did not pay contractors on time or in full.

41.     At times, Ms. Papkee's projects were delayed because contractors refused to work without pay. When contractors called and complained about not getting paid, she referred those callers to Mr. Lalumiere because MECAP was responsible for issuing payments.

42.     After about September 2018. Ms. Papkee remained an employee but employment taxes were no longer withheld from her paychecks.

43.     Even if Ms. Papkee was an independent contractor, she has standing to bring this claim against Defendants.

44.     The WPA protects "employees" from retaliation, and defines "employee" as follows:

> "Employee" means a person who performs a service for wages or other remuneration under a contract of hire, written or oral, expressed or implied, but does not include an independent contractor engaged in lobster fishing. "Employee" includes school personnel and a person employed by the State or a political subdivision of the State. 26 M.R.S. §832(1).

45.     Under this broad definition, anyone who performs a service for wages or other remuneration under contract of hire, written or oral, expressed or implied – except for lobster fisherpersons – are employees for purposes of the WPA.

46.     Beginning in about September 2018, Ms. Papkee performed services for Defendants in exchange for $1,200 per week.

47. At the time of these events, Mr. Lalumiere was a partner or member in business entities other than MECAP, including but not limited to LH Housing, LLC, which manages rental properties.

48. LH Housing had four partners: Mr. Lalumiere, Wayne Lewis, Eric Holsapple, and Steve Matthews.

49. One of Ms. Papkee's job responsibilities was to track the date of transactions and closings as it provided her with the ability to begin another project once funds from a previous sale were posted to the LH Housing account.

50. On about December 14, 2018, Ms. Papkee discovered that funds from the sale of a house located at 9 Brault Street, Lewiston, Maine, owned by LH Housing, were deposited in the MECAP bank account and not to the LH Housing account.

51. Ms. Papkee mentioned this to Mr. Lewis. He was not aware that funds from the sale of that house were received and deposited into Mr. Lalumiere's MECAP account.

52. Christine Seifer, who handled accounts receivables for MECAP, asked Ms. Papkee to send an email to Mr. Lewis in Colorado, telling him that she was mistaken and that the house had not been sold and no funds had been deposited.

53. Ms. Papkee did not agree to communicate false information to Mr. Lewis.

54. Ms. Papkee was concerned that Mr. Lalumiere and MECAP were stealing from Mr. Lewis, Mr. Holsapple, and Mr. Matthews.

55. During their phone conversation, Ms. Seifer confessed to Ms. Papkee that Mr. Lalumiere had instructed her to wire the money into the MECAP account.

56. Ms. Papkee told Ms. Seifer that she was not going to lie for Mr. Lalumiere and that when asked, she would tell the truth and let the chips fall where they may.

57. Being asked to lie for Mr. Lalumiere made Ms. Papkee very uncomfortable.

58. Ultimately, Ms. Papkee told Mr. Lewis by telephone what she had found out.

59. Mr. Lewis asked Ms. Papkee other questions which she answered honestly and to the best of her knowledge.

60. They discussed another house owned by LH Housing located at 294 Hio Ridge Shore, Bridgton, Maine, which produced rental income that was shared by MECAP and LH Housing.

61. Mr. Lewis thought that the house was empty.

62. Ms. Papkee told Mr. Lewis that in fact, the house was rented with a lease between the tenant and MECAP instead of LH Housing, the rightful owner.

63. Ms. Papkee's co-worker, Sara McKee, normally handled the leasing of homes owned by LH Housing.

64. In this case, Mr. Lalumiere instructed his assistant, Miranda Elkanrich, to market and rent the property to tenants.

65. Ms. McKee did not know that Ms. Elkanrich had been tasked to market and rent the property to tenants which raised concerns for Ms. Papkee and Ms. McKee that Mr. Lalumiere was hiding something.

66. Ms. Elkanrich was on vacation and Ms. Papkee was in charge of assisting the tenants if needed on move-in day, which was on about December 15, 2018.

67. Ms. Papkee helped coordinate minor maintenance to the heating system and got a copy of the lease, which is how she discovered that the parties to the lease were MECAP and the tenants and not LH Housing.

68. If Ms. McKee had handled the rental, she would have taken the deposit money and rent due and deposited it into the rightful account, i.e., LH Housing's account.

69. Ms. Papkee expected that Mr. Lewis would bring these matters up with Mr. Lalumiere and that it would cause problems between them but Ms. Papkee was not willing to participate in defrauding LH Housing.

70. Upon information and belief, Mr. Lalumiere and Mr. Lewis came to an agreement and Mr. Lalumiere returned to LH Housing the money it was owed from the proceeds of the sale of 9 Brault Street.

71. After that, Mr. Lalumiere became increasingly aggressive and degrading to Ms. Papkee both in person and via email.

72. Mr. Lalumiere behaved in such an abusive, combative and irrational way that it was clear that he knew that Ms. Papkee had uncovered and spoken out regarding his fraudulent handling of funds.

73. Ms. Papkee was involved in a civil lawsuit filed by MECAP against a contractor claiming monetary damages.

74. The case was filed in Androscoggin Superior Court on September 7, 2018.

75. The dispute was over work the contractor performed on a property located at 498 Turner Street in Auburn, Maine.

76. MECAP claimed that the contractor took funds and did not complete the work.

77. A motion for default judgment was filed on October 18, 2018 and granted by the court on November 14, 2018. A hearing on damages was set for December 4, 2018.

78. On about December 2, 2018, Mr. Lalumiere prepared a spreadsheet of costs that was not accurate.

79. On December 5, 2018, during the hearing on damages, Mr. Lalumiere tried to submit the spreadsheet as evidence of the damages owed by the contractor.

80. Mr. Lalumiere told the Judge that Ms. Papkee prepared the spreadsheet, which was not true.

81. The Judge asked Ms. Papkee if the numbers on the spreadsheet were accurate.

82. Ms. Papkee told the Judge that she was unable to confirm that they were.

83. The Judge rejected the spreadsheet and told Mr. Lalumiere that he needed more proof.

84. The Judge told Mr. Lalumiere that if he wanted to pursue the case, he would need to submit documents showing that MECAP paid a new contractor to finish work that the original contractor failed to complete.

85. The Judge told Mr. Lalumiere that he needed to submit detailed invoices that matched the checks paid to the new contractor.

86. The Judge also said that the new contractor would need to testify to the truth and accuracy of the invoices and checks.

87. MECAP's accounting manager, Christina Davis, was not able to locate checks that were issued to the new contractor in the amounts that Mr. Lalumiere put on his spreadsheet.

88. MECAP did not have any receipts to back up the payments as the contractor had not provided any to MECAP.

89. Mr. Lalumiere repeatedly told Ms. Papkee to have the new contractor "make up a bill-contract-receipt" to match the checks paid by MECAP.

90. Ms. Papkee was not willing to participate in what she, in good faith, believed to be fraud.

91. Ms. Papkee told Mr. Lalumiere many times that she was not willing to participate in fraud.

92. Mr. Lalumiere responded by becoming combative and abusive and by accusing Ms. Papkee of not doing her job.

93. For example, Ms. Papkee (then-Mancini) exchanged emails with Mr. Lalumiere about this on December 10, 2018:

> Mr. Lalumiere: Can you sent that our (sic) like now    I need this stuff off my list Please email it over
>
> Ms. Mancini: Scott, I can't do this without exact numbers and invoices from dash. I sat with Chris Davis about this on Friday. She also spoke at length with [MECAP's lawyer], this cannot he (sic) turned in as is. We need exact figures . . . Anything we turn in will be false, I am not doing that
>
> Mr. Lalumiere: At least have the spreadsheet done for our meeting tomorrow. Fill in the work that was done under the original agreement
>
> Ms. Mancini: Scott, I need numbers itemized from his work, so we aren't submitting false info. This can't be estimated.
>
> Mr. Lalumiere: Erin
> I got it
> But it needs to get done
> Have him come in
> Fill out the spreadsheet and have him prepare a bill that matches the spreadsheet

94. In Defendants' submission to the MHRC, Mr. Lalumiere admitted that the numbers on the spreadsheet were an estimate of damages, not actual damages.

95. Mr. Lalumiere knew that he was telling Ms. Papkee to help him with fraud. Otherwise, he would have asked Ms. Papkee to have the contractor prepare a bill that matched the work he actually performed, not the spreadsheet that was prepared by Mr. Lalumiere based on guesswork.

10

96. Ms. Papkee asked many times to meet with Ms. Davis and the MECAP attorney to work out what to do about MECAP's lack of evidence of its actual damages.

97. Ms. Papkee repeatedly told Mr. Lalumiere that they could not make his numbers work.

98. Mr. Lalumiere told Ms. Papkee that the numbers did not match because the house wasn't finished.

99. Mr. Lalumiere said that the checks to the contractor were "miscoded" in Quickbooks and that Ms. Davis would need to "fix" that.

100. Ms. Papkee had a good faith belief that this was fraud because this particular contractor had done many projects for MECAP.

101. Ms. Davis routinely cut checks to this contractor without invoices for multiple concurrent projects and without clearly stating what the funds were for.

102. This led Ms. Papkee to believe that Mr. Lalumiere would instruct Ms. Davis to re-code checks that paid for work on other projects to match the number he desired from the contractor he was suing.

103. Ms. Papkee also believed that Mr. Lalumiere was asking the contractor to make up a fraudulent bill to match his numbers so that Mr. Lalumiere could get the court to award him more damages than he was entitled to.

104. Mr. Lalumiere was furious with Ms. Papkee when she refused to help him defraud the court. On January 8, 2019, she (then known as Ms. Mancini) exchanged these emails with Mr. Lalumiere:

> Mr. Lalumiere:   Where are we with the documents [the attorney] is looking for? I thought we gave her everything she needed - that is what we discussed

| | |
|---|---|
| Ms. Mancini: | Nothing matches |
| | I have reached out to [the attorney], and we are coordinating the following |
| | Ryan's bills he gave me don't match the checks paid out to him. His invoice is off |
| | I have asked Chris to work with us and have -Updated checks paid through January |
| | - undated debt service amount paid |
| | - updated utilities and insurance |
| | -totals paid to other vendors (we have this) |
| | Once we have this number Ryan will have to make an invoice to match (to the dollar) |
| | |
| | We need to match the amount you put on the spreadsheet. We aren't there. I will talk to [the attorney] today and see if she wants anything else. |
| | |
| Mr. Lalumiere: | Ryan already agreed to provide us with an invoice that matches |
| | I really want this done   No matter what    On Thursday I want this entire package to [our attorney] and off our to do list |
| | |
| Ms. Mancini: | We need to take 15 mins which we haven't done and sit all together with her. Ryan included |
| | We are all trying to match the amount we submitted to the judge the first time. I'll work with Chris and [the attorney] and resolve |
| | |
| Mr. Lalumiere: | I did all of that |
| | That is why I put together the spreadsheet This is getting out of hand |
| | The judge already said she was not allowing some of our claim |
| | Our claim has to be for work he did not do on the bid he submitted |
| | That is why I took my time to do the spreadsheet |
| | |
| Ms. Mancini: | Scott |
| | We need to make the checks we paid match! They don't. |
| | Your number was way bigger. |
| | Again we need |
| | -matching invoice |
| | -proof we paid Ryan this amount |
| | -updated debt service - utilities |
| | I will meet with [the attorney], but I can't manifest these matching amounts unless we have checks to back it up |
| | |
| Mr. Lalumiere: | You want to get this done and move on |

12

>           Last week you talking about how everyone here hates me because I
>           miro (sic) manage stuff
>           Trust me - when you did this to us - it exploded here
>           Just the discussions we had - we all have to move on

Ms. Mancini:        You're going to have to be more clear

105.    Later that day, January 8, 2018, Ms. Papkee emailed the MECAP attorney, asking her (the attorney) if they were required to submit documents to the court that matched the spreadsheet Mr. Lalumiere presented on December 5, 2018.

106.    Ms. Papkee asked the attorney if they could submit a new spreadsheet because the actual documents did not support MECAP's claim for damages.

107.    Things came to a head on the morning of Thursday, January 10, 2019.

108.    Ms. Papkee and Mr. Lalumiere were in the break room before any other employees arrived at work.

109.    Mr. Lalumiere was arguing with Ms. Papkee again about not cooperating with his efforts to submit false information to the court. Mr. Lalumiere snapped and he came after Ms. Papkee.  He stormed across the room with his arms towards her, fast and angry. He looked like he was preparing to physically attack her.  Ms. Papkee put her hands up and screamed, "What the f*ck are you doing!  Get the f*ck away from me." Mr. Lalumiere told her, "Just GO!"

110.    Ms. Papkee left the break room and went to her "seating area," followed shortly thereafter by Mr. Lalumiere. Ms. Papkee was upset, crying, and gathering all of her things to leave. She told Mr. Lalumiere again to leave her alone. He said, "I never touched you" and "I never came after you." Ms. Papkee was shaken and kept backing away (there were file cabinets between them) but Mr. Lalumiere was between her and the exit. They went back and forth until Ms. Papkee put a file onto the file cabinet. Mr. Lalumiere took the file and walked away.

111. After that, Ms. Papkee believes that Mr. Lalumiere left the office on foot.

112. Almost immediately after Mr. Lalumiere left, the intern, John Logan, and Ms. McKee walked in to find Ms. Papkee collecting her belongings and crying.

113. Ms. Papkee spoke to both of them about what happened and then took her belongings and left using the back exit.

114. The dispute between Ms. Papkee and Mr. Lalumiere on January 10, 2019 was not about "a very serious mistake she had made" as Mr. Lalumiere alleged to the MHRC.

115. In fact, Mr. Lalumiere has never explained exactly what mistake Ms. Papkee allegedly made.

116. The dispute was about Ms. Papkee's refusal to help Mr. Lalumiere engage in fraud by submitting knowingly false information to the court.

117. Ms. Papkee was engaging in activity that is protected by the WPA, 26 M.R.S. § 833(1)(D) which provides, in part:

> No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because . . . the employee acting in good faith has refused to carry out a directive to engage in activity that would be a violation of a law or rule adopted under the laws of this State…

and 26 M.R.S. § 833(1)(A) which provides:

> The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

118. Mr. Lalumiere retaliated against Ms. Papkee for refusing to carry out his unlawful directive to help him defraud the court and for reporting what she reasonably believed to be a violation of law.

14

119. Mr. Lalumiere physically and verbally threatened her and terminated Ms. Papkee's employment by telling her to "just go."

120. The fact that Mr. Lalumiere terminated Ms. Papkee may be inferred from the fact that Mr. Lalumiere never contacted Ms. Papkee again and told other employees not to talk to her.

121. Alternatively, Mr. Lalumiere constructively discharged Ms. Papkee by lunging at her and telling her to "just go" in retaliation for her refusal to carry out his unlawful directive and reporting what she reasonably believed to be a violation of the law.

122. A reasonable person would find these working conditions objectively intolerable.

123. Assuming that Mr. Lalumiere viewed Ms. Papkee as an independent contractor, he knew or should have known that she could not return to his place of business without his invitation after he told her to "just go."

124. Defendants discharged, threatened and otherwise discriminated against Plaintiff regarding her compensation, terms, conditions, location or privileges of employment because she, acting in good faith, refused to carry out a directive to engage in illegal conduct.

125. Defendants discharged, threatened and otherwise discriminated against Plaintiff regarding her compensation, terms, conditions, location or privileges of employment because she, acting in good faith, reported orally and in writing to Defendants what she had reasonable cause to believe was illegal conduct.

126. For 89 weeks (that is, 57 weeks between date of hire on October 17, 2016 and the start of maternity leave on November 19, 2017, and then 32 more weeks after returning from maternity leave on February 14, 2018 and September 28, 2018 when Ms. Papkee was misclassified as an independent contractor), Ms. Papkee was paid $960 per week, worked 40 to 50 hours per week, and was not paid overtime.

127.    During the time frame referenced in paragraph 126 above, Defendants failed to pay Ms. Papkee for 455 hours at the proper overtime rate of $36 per hour, for a total underpayment of $16,380.

128.    For 16 weeks (that is, from September 28, 2018 until Ms. Papkee's last day of work on January 10, 2019), Ms. Papkee was paid $1,200 per week, worked 40 to 50 hours per week, and was not paid overtime.

129.    During the time frame referenced in paragraph 128 above, Defendants failed to pay Ms. Papkee for 80 hours at the proper overtime rate of $45 per hour, for a total underpayment of $3,600.

130.    During the six-year period prior to the filing of this complaint, Defendants owe Ms. Papkee $19,980 in unpaid overtime in violation of the Maine Wage Statute.

131.    During the two-year period prior to the fling of this complaint, Defendants owe Ms. Papkee $9,540 in unpaid overtime in violation of the FLSA.

132.    In spite of Ms. Papkee's diligent efforts to mitigate her loss of wages, she has not been able to find a comparable job since her employment with Defendants terminated on January 10, 2019. Her lost wages through December 25, 2019 are $71,250.

## COUNT I: FLSA VIOLATIONS

133.    Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1-132 as if fully set forth herein.

134.    The Defendants are subject to the requirements of the FLSA including the requirement to pay overtime premium(s) for hours worked in excess of 40 in a given workweek.

135.    Defendants have failed to pay Plaintiff overtime premiums which she is owed for work performed.

## COUNT II: MAINE WAGE STATUTE

136. Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1-135 as if fully set forth herein.

137. The Defendants are subject to the requirements of 26 M.R.S. § 664 including the requirement to pay overtime premium(s) for hours worked in excess of 40 in a given workweek.

138. Defendants have failed to pay Plaintiff overtime premiums which she is owed for work performed.

## COUNT III: WPA

139. Paragraphs 1-138 are incorporated by reference.

140. Defendants' conduct violated the WPA as enforced through the MHRA.

## COUNT IV: TORTIOUS INTERFERENCE

141. Paragraphs 1-140 are incorporated by reference.

142. A valid contract or prospective economic advantage existed between Ms. Papkee and MECAP.

143. Mr. Lalumiere was aware of the contract/prospective economic advantage between Ms. Papkee and MECAP and interfered with that contract or advantage with the intention of interference with and ending the contract/prospective economic advantage.

144. Mr. Lalumiere's interference proximately caused damages to Ms. Papkee.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendants to be in violation of her rights;

B. Enjoin Defendants, their agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C. Order Defendants to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' discrimination;

E. Award equitable-relief for back pay in the amount of $71,250 through December 25, 2019 and ongoing to the date of trial, plus benefits and prejudgment interest;

F. Award $19,980 in back pay for unpaid overtime under the Maine Wage Statute;

G. Award liquidated, treble damages under the Maine Wage Statute which totals $59,940;

H. Award $9,540 in back pay for unpaid overtime under FLSA;

I. Award liquidated, double damages under FLSA which totals $19,080;

J. Award compensatory damages in an amount to be determined at trial;

K. Award punitive damages in an amount to be determined at trial;

L. Award nominal damages;

M. Award attorney's fees, including legal expenses, and costs;

N. Award prejudgment interest;

O. Permanently enjoin Defendants from engaging in any employment practices which violate the WPA, MHRA, FLSA, and Maine Wage Statute;

P. Require Mr. Lalumiere to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate whistleblower retaliation or wage theft in the future;

Q. Require that Defendants post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

R. Require that Defendants train all management level employees on the protections afforded by the WPA, MHRA, FLSA, and Maine Wage Statute;

S. Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants unlawfully terminated her because whistleblower retaliation; and

T. Grant to Plaintiff such other and further relief as may be just and proper.

Dated:  January 8, 2020          */s/* Chad T. Hansen

Attorney for the Plaintiff

MAINE EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343
chansen@maineemployeerights.com